The Chancellor.
The complainants, in their bill, charge that they are seized in fee simple, as tenants in common, of certain lands, water power, mills, &c., situate at Mount Holly, in .the county of Burlington, in this state, on the waters of the Rancocus creek; and that they hold and enjoy as appurtment.do that property, the right of holding back the water of said creek by their dams, up the natural bed of the said creek, about four miles, to the mills of the defendants, formerly known as Parker’s mills; and further, that they, and those under whom they hold, have held, used and enjoyed this property, and have flowed back the water in manner aforesaid, for more than a century, and that their right so to do, has never been controverted.
That their dams and gates are so constructed that they can draw down the head of water at their mills, about four feet, and continue to drive their works, consisting of a grist-mill, sawmill, paper-mill, &c.
That the creek is very tortuous between the mills of complainants and defendants, being about four miles by the course of the stream, and one and three-fifths of a mile by the road, and by this winding course of the stream, the complainants have always derived great benefit, it forming for them a long and capacious pond, by which they were enabled to hold back a large supply of water for their mills.
That the mills and dams of the defendants have been erected long since the mills and dams of the complainants, and subject to their right of flowing back the water in manner aforesaid.
That the defendants purchased their mills in eighteen hundred and thirty-two, and at the time of their purchase, and un til some time in the year eighteen hundred and thirty-five, that the mill-dam gates of their mill were so situate, that their surplus water was discharged into the stream, immediately below their mills, and at the head of the pond of complainants.
*119 That the defendants, after purchasing, increased their establishment by erecting new factories, and finding that their waste water, when vented, sometimes created back water, in order to avoid that effect, in the summer or fall of eighteen hundred and thirty-five, they made an addition to their millpond, and formed new waste-gates, in such position that the water was discharged into the main stream or pond of the complainants, about two-fifths of a mile below the mills of the defendants, where the waste water had been before discharged.
That in the summer or fall of eighteen hundred and thirty-six, the defendants formed a dam across the main stream or pond of complainants, near the said new waste-gates, and cut a canal across the neck of land called W arner’s meadow, by which the course of the stream or pond was changed from its natural course, and forced through that canal, and the water fronxthe said new waste-gates, was turned into that part of the old bed of the stream which was cut off by said canal; and they then formed another dam across the pond, near the lower outlet of said canal, which prevented the water of said waste gates, from flowing into the pond at that place; and in order to give vent to that waste-water, they, the defendants, cut a canal across another neck of land, called Budd’s neck, and forced the waste water through that canal about twenty-two chains, where it was again discharged into the original stream or bed of the pond of the complainants, at a place called Earle’s neck ; and that they had cut a canal across Earle’s Neck, by which the course of the stream or pond was diverted from its original course, and a part of the original bed of the pond cut off.
And further, that the defendants were about to erect dams across the original bed of the stream or pond, at each termination of the said last mentioned canal; and to open another cut across the neck below, called Butterwortil’s neck, so that the waste water from said new waste-gates, by means of these new cuts and dams, would be m ade to flow in a channel entirely separate from the main stream or pond, until it emptied into the same at the lower part of Butterworth’s neck, near the mills of *120 the complainants, instead of being discharged into the said pond at the head of it, as it had from time immemorial been discharged.
They also charge that by this contrivance they are deprived of a part of their pond or reservoir, by means of the said dams cutting off a portion thereof; that other parts of their pond are and will be filled up by the sand and dirt washed out of those cuts; that the waste water flowing through this new cut having a greater fall than that flowing by the original bed of the pond, and being discharged in the pond near the dam, will escape more rapidly than if permitted to flow through its original course, and thereby deprive the complainants of the full benefit of their water; and farther, that by reason of the more rapid discharge of the water by means of this new cut, the works of the complainants will be more liable to be injured in times of high water; and they also charge .that the defendants have made and are about making their said canals or cuts so small that they cannot pass the water that will be required, and the soil being loose and sandy will consequently be washed into the pond below, as it is carried out of the cuts by the current of water which will continue to excavate those cuts until they shall have capacity sufficient for the flow of all the water, and all the earth which is washed out of those cuts must be deposited in the pond below, by means whereof its capacity will be diminished, and the complainants thereby injured.
And the complainants also charge, that by these dams and cuts they are deprived of the power of backing the water up to the mills of the defendants, as they formerly could, and of right should be permitted to do ; and that in a dry time they had no surplus of water, and by means of the said dams and cuts the capacity of their pond would be so diminished as to do them an irreparable injury, &c. And they pray that the defendants “may be restrained from any further diversion, alteration or damming up of said Rancocus creek, and from opening any channel, canal or race-way below their mill pond for the water of said creek to flow into, and from hoisting their said new waste *121 gates or flood gates, and thereby washing earth and sand into the said creek.”
An injunction was issued according to the prayer of the bill. The defendants have answered, and affidavits been taken; and the question now presented is, whether the injunction shall be dissolved, modified, or continued.
The defendants, in their answer, admit almost all of the material allegations of the bill, but deny most of its conclusions. The principal allegation of the bill which is not admitted by the answer, refers to the right of the complainants to flow back the water of the Eancocus to the dam of the defendants. The complainants claim this right, and allege that they and those under whom they hold, have enjoyed and used this right from time immemorial. The defendants, in their answer, admit that the complainants have held and enjoyed the right of backing the water up the stream some distance; but they are ignorant whether they possess and enjoy the right of backing the water up the stream to their mills. And if the complainants possess any such right, the defendants deny that they have ever used, exercised, or enjoyed that right, and they allege that in the year eighteen hundred and thirty-one, when they purchased their mills, the complainant’s mill-dams did not back the water to their mills, nor do they at this time. If the answer had stopped here it would have been a full answer and denial of the allegation of the complainants’ bill in that particular. But the defendants proceed in their answer, and say that “ the back-water of the defendants’ mill is created by the narrowness of the creek, and the quantity of water flowing down the same, and not by the complainants’ dam; for in the fall of the year eighteen hundred and thirty-one, there was a fall in the said stream from the lower point of the neck of land called Warner’s meadow, up to the defendants’ mills, of from six to eight inches.” Here they admit that they have back-water, but they charge it to the narrowness of the stream, and not to the dam of the complainants; and their allegation that the back-water is not occasioned by the dam of the complainants, is evidently a conclusion drawn *122 from the fact, that there are six or eight inches fall between their mills and the lower point of the neck of land called Warner’s meadow. This conclusion is evidently erroneous, for by inspecting the measurements of the depths of the stream or pond, it will be found that from the mills of the defendants down to-Warner’s meadow, the average depth is about four feet three inches, and that depth increases gradually from that point down to the dams of the complainants, where the average depth is more than six feet; so that there is a gradual fall in the stream from the one mill to the other, and it cannot be doubted that if the complainants’ dam were removed entirely, the water would sink at the lower part of Warner’s meadow, probably to one half its present depth, and thereby the water from above would escape more readily, and of course relieve the wheels of the defendants in some measure from their back-water. But the witnesses who have testified upon this subject all agree that there is, and always has been, back-water at the mills of the defendants; and the engineer puts the matter beyond controversy, for he says that he has levelled the stream, and finds the complainants’ full head about eight inches higher than the sheeting of the wheels of the defendants’ mills, and whenever the parties shall make the experiment, by stopping both mills and letting the water find its level in the pond of the complainants, they will find that the water will stand on the sheeting of the defendants’ mills.nearly a foot deep.
A very common error prevails as to the flowing back of the water by means of dams or other obstructions in the stream. The complainants have fallen into that error when they allege that they cannot now flow back the water further than Earle’s-cut, because they observe a curreut through that cut more rapid than the other parts of the stream. And the defendants have fallen into the same error when they allege that the complainants never flowed back to their mill, because there is a fall óf six or eight inches in the stream above Warner’s meadow.
The intervention of a ripple or rapid current, in a stream or pond, is no evidence that the water above that ripple or current *123 is not affected by tbe dam or obstruction below. And in this pond of the complainants, if its width were diminished one half for any distance, the water would flow through that part of the pond, while the mills were in operation, with double the velocity that it would flow through the other parts, and thereby create a-current or ripple, and yet the dam below would operate upon the water above that ripple; for it may readily be perceived, that if the dam or obstruction were removed from below, the water would of course sink, and thereby increase the rapidity of the current through the narrow part of the stream, and thereby permit the water above to escape more rapidly. I make these remarks to explain the difficulty under wdiich the parties and witnesses appear to have labored — being entirely satisfied, not only from the testimony of the witnesses, but from the answer of the defendants themselves, that the dam of the complainants flows the water back to the mills of the defendants. Some-question was made upon the argument of the cause, as to the time that the complainants and those under whom they hold, have used, occupied and enjoyed this privilege of flowing back the water in the manner it is now used; but it is evident, from the whole testimony, that the works of the complainants have existed from time immemorial — that the works of the defendants were erected in the year seventeen hundred and eighty; since that time, no complaint has been made, that the complainants have raised their head ; and in fact, the evidence shows the contrary as far as a negative can be proved ; and I am of opinion that the complainants have a right to flow back the water to the mills of the defendants, in the manner that their dams, as at present constructed, will flow it back, and this right is as absolute as any other right which the complainants can have, and for its violation the law gives them an ample remedy.
The next question for consideration, is, whether the defendants have violated this right, and if so, whether the complainants have sought the proper remedy. And as to the remedy, it is objected on the part of the defendants, that even if the complainants had a remedy by injunction, they have lost it by stand *124 ing by and permitting the defendants to go on expending money in these improvements, without objection. As to this point, the facts are, that the defendants made their new waste-gates in eighteen hundred and thirty-two, and put them up in eighteen hundred and thirty-three; this was done by the knowledge and partly under the advice of one of the complainants. By this work the waste water was discharged into the main stream about two-fifths of a mile below the mills of defendants, where it had theretofore been discharged. No objection was made to this change by the complainants.
In the summer and fall of eighteen hundred and thirty-six, the defendants proceeded to make the dams across the stream at "Warner’s meadow, and the cut across Budd’s neck, and were proceeding to make the cut across Butterworth’s neck, when the injunction was served upon them, in February, eighteen hundred and thirty-seven.
If there were any necessary connection between the formation of the waste-gates in eighteen hundred and thirty-three, and the subsequent formation of the cuts and dams in eighteen hundred and thirty-six, I should consider that the complainants had lost their remedy by their laches; but I see no necessary connection between the two works, either from their nature, or from the evidence in the cause. It is true, that the latter operation of forming the dams and cuts, may probably have been suggested by the fact that the operation of the waste-gate had been benefical to the defendants; but the formation of these waste-gates was a work in itself perfect and could not have been considered as giving notice to any one, that the plan was to be extended, by those dams and cuts; and there is no evidence that at the time they themselves had any further view than merely the formation and use of the waste-gates.
Considering it, then, as a work commenced in the summer of eighteen hundred and thirty-six, and carried on during that fall and winter, and not completed in February, when the complain ants adopted the remedy, I can find no case in the books that would warrant me in declaring that the complainants had lost *125 their remedy; and if such a case could be found, I should not be disposed to follow it.
The defendants also object to that part of the injunction which prohibits the use of the waste-gates, contending that it amounts to a destruction of that work, which was put up by the consent of the complainants themselves. The objection is not well taken. If they had confined the use of the gates to their original purpose, then the complainants conld not have complained ; but when they attempt to divert them to a different purpose, which is injurious to the complainants, then the reason of the objection fails. And in this case, if the defendants had carried their cuts so as to discharge the waste water into the stream below the mills of the complainants, it would hardly be contended thal the party would be deprived of his remedy, merely because the gates had originally been erected by the consent of the complainants, for the purpose of discharging the waste water in tho stream near them; and yet, in such case, the court could not give the remedy, except by in joining the defendants from hoisting those gates so that the water should pass by the complainants’ mills.
The only remaining inquiry, is, whether the complainants have made a case requiring the interposition of this court, by its restraining power. The answer admits all the facts charged in the bill, as to the making the dams and cuts, and their intention to finish their plan, so that the waste water should bo discharged into the pond of the complainants, below Butterworth’s neck; but deny that this work will prejudice the complainants; on the contrary, they allege that it will be a decided benefit to them, and upon this subject there appears some contrariety of opinion among the witnesses.
It may here be remarked, that the complainants are entitled to the use of the whole of the bed of this stream, as far back as they flow, in the manner they have been accustomed to use it, and it behooves any one who would change that manner of use, to show most conclusively, that the change could not injure them. I do not, however, intend to express an opinion that tho *126 ■complainants could be compelled to submit to such change, even if no injury could be proved to result therefrom. But in this case, I think it most manifest, that the complainants will suffer serious and irreparable injury, by the completion and continuance of these cuts and dams, according to the plan proposed. I make this conclusion as well from the direct evidence upon the jtoint, as from .the nature and consequence of the work itself.
It is evident, in the first place, that by the canals across War ner’s meadow and Earle’s neck, and the dams thrown across the stream at the extremities of those cuts, the complainants will be ■deprived of so much of their pond or reservoir, as the portions of the pond cut off exceed the canals which are substituted.
In the next place, it will tend to fillup the pond with the sand and dirt washed out of the cuts, and form bars across the pond, which may seriously affect the complainants in the use of the water of theirpond; and in this respect, serious injury is to be apprehended, particularly from the cut across Butterworth’s neck. It will be remarked, that that cut enters into the pond at its lower extremity, nearly at right angles; as it is partly dug, and proposed to be finished, its capacity is not sufficient for the flow of water which must pass through it, without creating a very rapid current, and the ground at that place being sandy and gravelly, it will necessarily form a bar across the main stream or pond, as the water of this cut will flow across the pond, and thereby check the stream of the pond, (being more sluggish,) and form an eddy immediately below the current from the cut, where the sand and dirt will be deposited. These consequences I consider as certain, and certainly injurious to the complainants.
As to the effect of discharging the wastewater of defendants into the pond of the complainants, near their dam, instead of discharging it at the head of their pond, there appears to be a contrariety of opinion in the minds of the witnesses; and if that power were used with an eye to the interest of the complainants, I cannot perceive that any serious injury can be apprehended *127 from it nor can I imagine that it would be of any service to the complainants. But one result is certain, it would give to the defendants a greater control of the water than they now have, and enable them, if disposed to injure the complainants, to use it much more effectually for the purpose; as it now is, they have to discharge their waste water through these flood-gates only, and that at the head of the pond, and of course the water has to pass through and fill up the tortuous channel of the pond for four miles, before it reaches the dam of complainants; bit if these new cuts and dams are made, the defendants have an additional and much more rapid discharge for their waste waters, and by throwing it rapidly into the pond below, it must necessarily escape over the dam of the complainants, and may thus escape without Ailing up the pond, as it must have done, if admitted at the head.
Upon the whole evidence, I am satisAed that the projected plan of the defendants, if permitted to be carried into execution, would do the complainants a serious and irreparable injury, and •therefore, cannot consent either to dissolve or modify the injunction.
*Order accordingly.
Cited in Veghte v. Rar. Wat. Pow. Co. 4 C. E. Gr. 153; Rar. Wat. Pow. Co. v. Veghte 4 C. E. Gr. 476; Carlisle v. Cooper, 6 C. E. Gr. 595.

 From this decision of the chancellor an appeal was taken by the defendants, and tlio decision affirmed, with costs, by the court of appeals, at November term, eighteen hundred and forty-one — eleven of the members voting for affirmance, and three for reversal.